THE STATE OF OHIO, APPELLEE, *v.* ADAMS, APPELLANT.

[Cite as *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845.]

(No. 2001–2072—Submitted August 17, 2004—Decided November 17, 2004.)

MOYER, C.J.

{¶ 1} Shortly before midnight on October 11, 1999, defendant-appellant, Stanley T. ("Ted") Adams, entered the home of Esther Cook and her 12–year–old daughter, Ashley Dawn Cook, in Warren, Ohio. Once inside, Adams killed them by beating and stabbing Esther, and by beating, raping, and strangling Ashley. A jury convicted Adams of the aggravated murders of Esther and Ashley as well as aggravated burglary, kidnapping, and two counts of rape. The jury recommended the death penalty, and the trial court sentenced Adams to death. Adams now appeals his convictions and death sentence directly to us as a matter of right.

{¶ 2} *State's evidence* From Christmas 1998 until March 1999, Adams and his girlfriend, Janelle ("Nelly") Hartle, lived with Esther and Ashley on Dickey Avenue in Warren. After March 1999, and at the time of the murders, Adams and Janelle and their infant daughter lived on Mahoning Avenue in Champion, Ohio. James Hartle, who sometimes lived with Esther, was the father of Ashley and Janelle, who were half-sisters.

{¶ 3} On the afternoon of October 11, 1999, Adams borrowed a blue 1991 Chevrolet Cavalier, Ohio license number BAB 2830, from his neighbors, Mike and Kelly Henry. Adams then drove to James Hartle's house, where he asked to borrow $300 from Hartle to buy a car. Hartle declined to give Adams any money.

{¶ 4} Later that evening, Adams attended a drug party at the apartment of his friend, Mallory "Stacie" Jackson. In addition to Adams, guests included Renee Smith, Patricia Litsinger, and Derwin ("Stormin' ") Norman. That night Adams was wearing a white T-shirt, blue pants, and white tennis shoes. When Smith saw Adams, whom she had known for five years, he had $40 "and bought crack cocaine with it." Later, Adams told Litsinger that he was "broke," but he offered cocaine to her in exchange for oral sex. Litsinger refused.

{¶ 5} After that, Adams left and told Smith that he was leaving "to get some more money." Smith reported that Adams was gone a long time. By the time Litsinger left, around 11:15 p.m., Adams had already left by himself in his search for more money.

{¶ 6} That same night, October 11, Luetta Simmons, who lived across the street from Esther and Ashley, noticed that a dark-colored car pulled into Esther's driveway at 11:45 p.m., and that the car left around 12:15 a.m. The taillights on this car resembled the taillights on a Chevrolet Cavalier that

Simmons had once owned. Simmons later noticed that neighborhood dogs were barking an in unusually "loud and obnoxious" manner.

{¶ 7} Adams returned to Jackson's apartment. According to Smith, Adams "had blood all over his hands; * * * on his shirt, on his pants, and on the tip of his shoes," and some of the blood appeared wet. In his pocket, Adams had "[m]oney with a whole bunch of blood on it." Litsinger also observed that after Adams returned, he had blood on his hands and on his jeans.

{¶ 8} At some point after he returned, Adams took his bloody shirt off. Norman recalled seeing Adams at the apartment when he "didn't have a shirt on," had "blood on him," and had a roll of money, some of which had blood on it.

{¶ 9} Later, Adams again left the apartment, but this time he left with Jackson and Norman to get more drugs. Adams, driving a blue Cavalier, dropped Norman off to buy the drugs. Around 2:00 a.m., while Adams was driving around the block, Warren Police Sergeant Robert Massucci pulled Adams over because the Cavalier had only one headlight. Sgt. Massucci noticed that although the weather was cold, Adams was not wearing a shirt, and that Adams had blood on his pants, including a spot approximately four inches by six inches.

{¶ 10} Warren Police Officer Jeff Miller, who stopped to assist Massucci, frisked Adams and discovered that "his pants were all wet and sticky, * * * gooey." With the aid of his flashlight, Miller discovered that Adams had blood on his hands, right arm, and pants, and Miller reported that the amount of blood suggested that Adams had "field dressed a deer." Adams told Miller that he had cut his hand, but Miller looked and saw no cuts. In the back of the Cavalier, Miller noticed tools and toolboxes.

{¶ 11} Adams told Sgt. Massucci that he lived on Dickey Avenue, although his driver's license listed a different address. The officers then let Adams go with a warning about the headlight. Later, Janelle recalled that Adams had come home "in the middle of the night."

{¶ 12} Around noon on October 12, 1999, Esther's friend, Donna Frederick, found Esther's "cold" body inside the front door of Esther's home. Frederick called police. A neighbor reported that she had seen Esther and Ashley alive the previous afternoon around 5:30 p.m.

{¶ 13} Police found Esther's body lying face-down in a pool of blood at the bottom of the stairs. On the stairs and stairwell walls, police found blood drops and smears. Police found Ashley's body in an upstairs bedroom. Dr. Humphrey Germaniuk, a forensic pathologist, arrived at the crime scene around 1:00 p.m. that day and estimated that Esther and Ashley had been dead "eight, ten, 12 hours at least."

{¶ 14} Dr. Germaniuk, who later performed an autopsy on Esther, concluded that she died as a result of "[m]ultiple blunt force traumatic injuries and multiple sharp force traumatic injuries" with "at least four distinct stab wounds involving the neck and head." Although police found pieces of a broken broom near the bodies of Ashley and Esther, police found no weapon that might have caused Esther's injuries. Dr. Germaniuk concluded that in inflicting the puncture wounds on Esther, the killer used "some type of tool that has an acute angle" and two prongs, such as a certain type of crowbar.

{¶ 15} Ashley's body lay upstairs on a bedroom floor next to the bed. Her body was nude and posed, with her legs spread apart. An electric cord had been wrapped five times around her neck, and one end of the cord was in her hand. A bracelet and two earrings had been placed on Ashley's lower abdomen. After an autopsy, Dr. Germaniuk concluded that Ashley had died as a result of "strangulation associated with blunt force trauma to the head." Ashley's body also revealed multiple injuries and bruises to the genitalia as well as brain swelling, contusions to the head, and lacerations to the mouth.

{¶ 16} Dr. Germaniuk also completed a rape kit examination during his autopsy of Ashley and obtained swab samples from her body cavities. Forensic Scientist Steve Wiechman, from the Ohio Bureau of Criminal Identification and Investigation ("BCI"), concluded that rectal, vaginal, and oral swabs from Ashley's body tested positive for semen.

{¶ 17} After later tests, Meghan Clement, an expert in DNA analysis at LabCorp, an independent testing laboratory, conducted polymerase chain reaction ("PCR") analysis of DNA on the oral and vaginal swabs from Ashley's body and concluded that they contained a DNA mixture. Adams and Ashley could have both contributed DNA to the mixture, and nothing in the analysis suggested that anyone else had contributed DNA to these specimens. The rectal swab, while testing positive for semen, was insufficient to yield a DNA result other than Ashley's DNA.

{¶ 18} Dr. P. Michael Conneally, a Distinguished Professor of Medical and Molecular Genetics at Indiana University Medical Center, who is an expert on genetic statistics, agreed that genetic markers for the secondary DNA contributor in the vaginal swab matched Adams, who is Caucasian. A similar DNA profile occurs only once in 77,000 Caucasians, once in 2.3 million African-Americans, and once in 128,000 Hispanics.

{¶ 19} At the crime scene, police found no money in the house. The bedroom where Ashley's body was found was in disarray, as if it had been ransacked. Two dressers were overturned, and blood spatters were found on the ceiling, floor, and on dresser contents. BCI Forensic Scientist Wiechman subjected two bloody sheets from the bedroom to forensic analysis. Wiechman found 17 presumptive

semen stains on different parts of one sheet, tested six of them, and confirmed that three of these were semen stains.

{¶ 20} Jennifer Duvall, an Ohio BCI forensic scientist, found DNA from semen stains in several areas on the same sheet. Adams could not be excluded as a contributor to the DNA in these stains, and his DNA was consistent with DNA in the stains. Duvall testified that DNA found at one particular site, which was identical to Adams's DNA, would be found only once in 21.1 million Caucasians and once in 1.9 million African–Americans. When Adams and Janelle lived with Esther and Ashley seven months previously, they slept in a downstairs bedroom and never used any of the upstairs bedrooms.

{¶ 21} On October 13, police seized the blue Cavalier that Adams had driven on October 11 and 12, which Mike Henry had loaned him. Forensic testing disclosed that the steering wheel, one of the floor pedals, and the headlight lever in the Cavalier tested positive for blood, but the quantity was insufficient for analysis. On October 19, Mike Henry asked Adams why police had found blood in Henry's car after Adams had borrowed it. During this conversation, Adams denied any responsibility for the murders.

{¶ 22} On October 20, police interviewed Adams after fully advising him of his *Miranda* rights. Adams waived those rights and gave both an audiotaped and videotaped statement of his activities on October 11 and 12. In these interviews, Adams initially denied any knowledge of the murders. After continued questioning, Adams admitted that he had stopped at Esther's house the night she was killed and that he had briefly entered the residence. Adams claimed that he had fallen over Esther's body and had then gone upstairs and found Ashley's body. He quickly departed, and he did not tell anyone what he had found. Adams admitted that on October 12, he had burned his bloody tennis shoes and trousers. In Adams's backyard police found a pile of ashes that contained a belt buckle and shoe eyelets.

{¶ 23} In addition to the police, Adams told others that he had discovered the bodies on the night of October 11 but had not notified authorities. On October 26, he was "on the verge of crying" when he told his friend, Kevin Clements, that he had found the bodies and had "tripped over Esther." He also told his girlfriend, Janelle, and his sister, Tina Maus, that he had tripped over Esther's body in the house that night. Later, he admitted to Tina that he had also found Ashley's body.

{¶ 24} ***Defense case*** The defense moved for acquittal under Crim.R. 29, and the trial court denied the motion. The defense then recalled Detective Jeffrey Hoolihan, one of the investigating detectives. Detective Hoolihan agreed that police did not take certain investigative steps, such as examining an open window

or a jewelry box for fingerprints, searching the neighborhood for weapons, or pursuing James Hartle as a murder suspect.

{¶ 25} *Procedural history* The grand jury indicted Adams on three counts of aggravated murder involving the deaths of Ashley Cook and Esther Cook, aggravated burglary, kidnapping of Ashley, and three counts that he had raped Ashley.

{¶ 26} Counts 1 and 2, relating to the aggravated murder of Ashley, included seven identical death-penalty specifications alleging murder (1) as part of a "course of conduct," R.C. 2929.04(A)(5), (2) while committing aggravated burglary, R.C. 2929.04(A)(7), (3) while committing a kidnapping, R.C. 2929.04(A)(7), (4) while committing vaginal rape, (5) anal rape, and (6) fellatio rape, all in violation of R.C. 2929.04(A)(7), and (7) of a child under 13 years of age, R.C. 2929.04(A)(9). Count 3, charging the aggravated murder of Esther, listed three specifications, namely, murder (1) as part of a course of conduct, (2) during an aggravated burglary, and (3) during a kidnapping.

{¶ 27} The jury acquitted Adams of anal rape, as charged in Count 7 and in specification 5 of Counts 1 and 2, but convicted him of all remaining charges and specifications. Count 2 (child murder) was dismissed on motion of the state. Following a penalty-phase hearing, the jury recommended the death penalty for the murder of each victim, and the trial court sentenced Adams to death.

{¶ 28} In his direct appeal to our court, Adams presents 17 propositions of law. We find merit in proposition of law VI. Hence, we set aside the conviction of Adams for kidnapping and the findings of guilt relating to the R.C. 2929.04(A)(7) specifications charging murder in the course of a kidnapping. We find that his other propositions of law lack merit, and we affirm the findings of guilt. We have also independently weighed the aggravating circumstances against the mitigating factors as to each murder victim and have considered the proportionality of the death sentence. For the reasons that follow, we otherwise affirm the judgment of the trial court and the death sentences imposed against Adams.

## Pretrial Issues (I, III, IV, V, X)

{¶ 29} *Pretrial suppression—ineffective assistance* In proposition of law I, Adams argues that his counsel provided ineffective assistance by failing to file a motion to suppress pretrial statements that Adams made to the Warren police on October 20, 1999. In those audiotaped and videotaped statements, Adams admitted that he had discovered the bodies of Esther and Ashley, but he denied any responsibility for their deaths.

{¶ 30} For Adams to obtain a reversal of a conviction or sentence based on ineffective assistance of counsel, he must prove (a) deficient performance ("errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment") and (b) prejudice ("errors * * * so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 31} We conclude, however, that Adams's claim of ineffective assistance of counsel lacks merit. First, Adams has not demonstrated deficient performance. Trial counsel cannot be second-guessed as to trial strategy decisions. In fact, the " '[f]ailure to file a suppression motion does not constitute per se ineffective assistance of counsel.' " *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, quoting *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 32} In this case, counsel for Adams appear to have made a tactical judgment that the best way to defend Adams would be to permit his strong claims of innocence to be admitted into evidence. In these October 20 statements, Adams persistently denied any thefts from the house, any sexual contact with the victims, and any responsibility for their deaths.

{¶ 33} Counsel's trial strategy took advantage of the fact that Adams strongly proclaimed to police before trial that he was innocent of these charges. To illustrate this strategy, defense counsel in his opening statement noted that two "trained, experienced police officers" subjected Adams to "an intense interrogation * * * for almost three hours." Counsel further noted "[t]here are no less than * * * 50 accusations of assaults, beatings, on these two decedents, and there are just as many explained denials by Stanley that, 'I did not do this, I did not have anything to do with this.' " In closing argument, counsel resumed this strategy by stressing Adams's protestations of innocence, e.g., "Stanley does not waiver [sic], and his statement remains the same, I didn't do this."

{¶ 34} By deciding not to attempt to suppress these pretrial statements, counsel had the benefit of having Adams's exculpatory explanation of events in evidence, without the risk of having Adams take the stand in his own defense. By not testifying, Adams never had to face a prosecutor's cross-examination. Further, Adams never had to face devastating impeachment by means of his prior felony convictions, which included a recent murder conviction. See, e.g., *State v. Beckett* (May 11, 2001), Holmes App. No. 00CA008, 2001 WL 520970 ("[b]y allowing the admission of [pretrial] statements to police * * *, counsel was able to present this defense * * * without putting appellant on the witness stand"); *People v. Newman* (Mich.App.2000), 2000 WL 33522090 (allowing into

evidence a voluntary, exculpatory pretrial statement is a matter of trial strategy, not ineffective assistance).

{¶ 35} Second, in order to demonstrate deficient performance, Adams must establish that a basis existed to suppress his pretrial statements. See, e.g., *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 165–166, 749 N.E.2d 226 (where the record contains no evidence justifying a motion to suppress, defendant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion).

{¶ 36} In fact, the record strongly indicates that counsel would have been unsuccessful in attempting to suppress Adams's pretrial statements. Police advised Adams of his *Miranda* rights by reading the form to him, and Adams freely signed a waiver of those rights. Adams said that he understood his rights, and the record shows that his *Miranda* waiver and ensuing statements were voluntary. The audiotaped and videotaped statements reveal that Adams remained in control of himself throughout the interview by persistently and strongly claiming his innocence. Police never threatened or coerced Adams, and Adams never asked for a lawyer or expressed reluctance to talk with police. Moreover, at the time of the offense, Adams was 33 years old and experienced in the criminal justice system.

{¶ 37} Under the totality-of-circumstances test, the facts show that Adams understood and voluntarily waived his *Miranda* rights and that his pretrial statements to police in which he proclaimed his innocence were voluntary and admissible. See *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. See, also, *State v. Green* (2000), 90 Ohio St.3d 352, 366, 738 N.E.2d 1208; *State v. Eley* (1996), 77 Ohio St.3d 174, 178, 672 N.E.2d 640; *State v. Brewer* (1990), 48 Ohio St.3d 50, 57–58, 549 N.E.2d 491.

{¶ 38} Third, counsel for Adams could also have decided that any motion to suppress Adams's statements to the police would have been pointless. Adams told several others, including a friend, his sister, and his former girlfriend, that he had discovered one or both of the bodies on the night of October 11.

{¶ 39} Finally, Adams has not established that any prejudice resulted from the admission into evidence of his pretrial statements to police. "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. In this case, the conviction of Adams did not hinge on evidence of his exculpatory pretrial statements because compelling evidence established his guilt. Thus, we reject proposition of law I.

{¶ 40} *Asserted venire-person misconduct* In proposition of law III, Adams argues that because of asserted misconduct by an unknown member of the venire, he was denied a fair trial by an impartial jury. Adams cites an incident that occurred in a jury waiting room during voir dire. Prospective jurors were standing in line to sign a list of those who had heard or read about the case. While in line, a prospective juror, Harriet Dickerson, heard someone behind her comment, "I know we're not supposed to talk about this, but I believe he's guilty. When I looked at the newspaper this morning, I was afraid that I was going to have to be on this case."

{¶ 41} Dickerson could not identify the person who made this remark. Dickerson testified that another prospective juror reportedly had heard the comment and said that she "couldn't believe" that someone had said that. During individual voir dire, Dickerson disclosed the incident to the trial court. After briefly questioning Dickerson, defense counsel did not pursue the matter. Although Dickerson was not challenged for cause, she did not sit on the jury.

{¶ 42} Admittedly, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips* (1982), 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78. However, *Smith* holds that the party complaining about juror misconduct must establish prejudice. Id. at 215–217, 102 S.Ct. 940, 71 L.Ed.2d 78. See *United States v. Zelinka* (C.A.6, 1988), 862 F.2d 92, 95.

{¶ 43} We reject the defense claim of prejudicial error for several reasons. First, counsel could reasonably decide that this casual remark in a jury waiting room was innocuous and that no purpose would be served by further inquiry. We do not second-guess trial strategy decisions such as those made by counsel during voir dire. See *State v. Mason* (1998), 82 Ohio St.3d 144, 157, 694 N.E.2d 932. We also reject Adams's claim that the trial court should have, sua sponte, conducted a further inquiry. See *State v. Hessler* (2000), 90 Ohio St.3d 108, 115–116, 734 N.E.2d 1237 (on juror misconduct, "we show deference to the trial judge, who sees and hears the events and thus is in a better position to accurately evaluate the situation and determine the appropriate scope of inquiry").

{¶ 44} Second, no misconduct by an actual juror occurred in this case. Instead, an unknown prospective juror made a casual comment in a jury-selection waiting room suggesting a preconceived opinion. When this unknown person made this remark, no jury had been seated or sworn, nor had the court instructed jurors on their obligations.

{¶ 45} Third, Adams has not established prejudice because the person who made the remark, or anyone who heard it, may never have sat on the jury that tried Adams. "A claim of juror misconduct must focus on the jurors who were actually seated and not those excused." *State v. Williams* (1997), 79 Ohio St.3d 1,

4, 679 N.E.2d 646, citing *Ross v. Oklahoma* (1988), 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80. We have a " 'long-standing rule * * * not [to] reverse a judgment because of the misconduct of a juror unless prejudice * * * is shown.' " *State v. Hipkins* (1982), 69 Ohio St.2d 80, 83, 23 O.O.3d 123, 430 N.E.2d 943, quoting *State v. Kehn* (1977), 50 Ohio St.2d 11, 19, 4 O.O.3d 74, 361 N.E.2d 1330. Accord *State v. Keith* (1997), 79 Ohio St.3d 514, 526, 684 N.E.2d 47. Further, under Crim.R. 33(A), juror misconduct justifies a new trial only if it materially affected an accused's substantial rights. See, also, R.C. 2945.79(B).

{¶ 46} Finally, the trial court and counsel in this case thoroughly and individually voir dired all prospective jurors in order to uncover any bias, prejudice, or preconceived opinions based on pretrial publicity or out-of-court discussions. This extensive voir dire lasted for 11 days, and the court and counsel readily agreed on those who should be excused. In fact, over 30 prospective jurors were excused because of pretrial publicity or knowledge of the case. Moreover, the trial court thoroughly instructed the jury to avoid pretrial publicity, not to discuss the case, and to decide the issues only on the evidence presented in court. Hence, we reject proposition III.

{¶ 47} ***Change of venue*** In proposition of law IV, Adams contends that because of pervasive pretrial publicity, the trial court erred in refusing to change venue.

{¶ 48} "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd* (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751. However, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 49} Changes in venue help protect fair-trial rights. A trial court can change venue "when it appears that a fair and impartial trial cannot be held" in that court. Crim.R. 18(B); R.C. 2901.12(K). "A change of venue rests largely in the discretion of the trial court." *State v. Fairbanks* (1972), 32 Ohio St.2d 34, 37, 61 O.O.2d 241, 289 N.E.2d 352. Accord *State v. Montgomery* (1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167. Moreover, we have held that " 'a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " *State v. Davis* (1996), 76 Ohio St.3d 107, 111, 666 N.E.2d 1099, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. Accord *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304; *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710.

{¶ 50} Under Crim.R. 18(B), counsel filed a pretrial motion to change venue, renewed the motion during voir dire, and later renewed the motion after the jury's guilty verdict. A few of the newspaper articles submitted in support of the motion definitely disparaged Adams, while others simply described the fact that a

jury was being empanelled. For example, a Warren Tribune Chronicle article, dated September 9, 2001, "Portrait of a Killer," described in depth Adams's background and criminal record, including details of his prior murder conviction, and indicated that he was a suspect in other unsolved murders. Publicity continued after the guilty verdicts, but before the October 3 penalty verdict. An article on September 27, 2001, notes that Adams was found guilty and "was a suspect in a number of unsolved homicides and 'may be a serial murderer.'" An editorial on September 30, 2001, discusses the question "Is Adams a serial killer?"

{¶ 51} In spite of the publicity before and during the trial, Adams has not demonstrated that the trial court abused its discretion in denying the motion for a change of venue. The trial court conducted extensive individual voir dire of prospective jurors to ensure that they were not prejudiced by publicity about the case. During individual voir dire, the judge cautioned each juror not to discuss the case or read or listen to media reports. On September 11, 2001, just before the final jury was selected, the trial court again individually voir dired each remaining prospective juror to ensure that they were still not contaminated by media reports. The record reflects that six sitting jurors had not read or heard anything about the case.

{¶ 52} Nonetheless, Adams contends that six of the jurors may have been adversely affected by pretrial publicity: Jurors Fonce, Eucker, Kuzmaul, DePalma, Griffin, and Jagiella. Yet, Adams did not challenge any of these six jurors for cause, which indicated that he was satisfied with those individuals when they were seated as jurors. See *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 37; *State v. Maurer* (1984), 15 Ohio St.3d 239, 252, 268, 15 OBR 379, 473 N.E.2d 768.

{¶ 53} Moreover, the record affirmatively reflects that pretrial publicity never adversely influenced any of those six jurors. Juror Rhonda Fonce thought that she "remember[ed] reading something in the newspaper" about the case, but recalled no details, had formed no opinion, and said that she would decide the case only on the evidence. When later questioned on September 11, Fonce continued to assert that she had not read media reports. In initial voir dire, Juror Edward Jagiella agreed that he had read about the case in newspapers. But he said that he would decide the case on the evidence before him: "That is my philosophy. I want to know all of the evidence." Later, he reported that all he could remember was "something about a girl being killed and a child."

{¶ 54} Juror Gerald Eucker had read about the case a long time before trial and recalled that it involved a mother and daughter. Eucker also believed that Adams had been "associated" with another woman's murder, but he did not "know whether he [had] been convicted or [was] just a suspect" and had "no idea" whether Adams had anything to do with that case. Eucker agreed to decide this

case only on the evidence at trial. Later, Eucker reported that he had "very little knowledge about this case," but recalled that the victims were killed on Dickey Avenue. When questioned on September 11, Eucker agreed that he had seen Adams's picture in the weekend paper and had seen the headline, "Portrait of a Murderer," but he did not read the article or form any opinion.

{¶ 55} Juror Deborah Kuzmaul heard "news that there was an upcoming trial." But she does not read the newspapers, knew only that a man was being tried for murder, did not know anything about the facts, and had no opinion about the case. At the initial voir dire, Juror Joseph DePalma asserted that he had no independent recollection of the case from the media. When questioned on September 11, DePalma agreed that he had seen Adams's picture in a weekend paper but said that that photograph had no impact on him and he had not read the article. Because he had the paper with him, he surrendered it, except for the sports section. In initial voir dire, Juror Kenneth Griffin reported that he knew nothing about the case. On September 11, Griffin noted that he received the weekend paper, but he had never read or listened to any media reports about the case.

{¶ 56} In sum, extensive voir dire demonstrated that each of the six jurors who had been subjected to media exposure knew very few details, if any, had no opinion about the responsibility of Adams, and agreed to decide the case only on the evidence at trial. Thus, Adams has not shown that any juror was biased. "A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. Only in rare cases may prejudice be presumed." (Citation omitted.) *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 35. Also, at the end of the trial, the trial court noted that once trial had commenced, "there is absolutely no evidence whatsoever that any of the articles * * * have come to the attention of the jury."

{¶ 57} Therefore, we conclude that the trial court's careful, individual, and sequestered voir dire of each juror on two separate occasions showed that six jurors had no knowledge of the case. Six remaining jurors recalled only sketchy details, if any, from media exposure. Further, the trial court individually cautioned each juror not to read or listen to media reports, and collectively advised the jury on that point many times.

{¶ 58} Under these circumstances, we hold that the trial court did not abuse its discretion by declining to change venue. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 30 ("the trial court took effective steps to protect the defendant's rights"); *State v. White* (1998), 82 Ohio St.3d 16, 21, 693 N.E.2d 772 ( "[i]t is rare for a court to presume that a jury is prejudiced by pretrial publicity"); *State v. Bies* (1996), 74 Ohio St.3d 320, 324, 658 N.E.2d 754. We reject proposition IV.

{¶ 59} ***Incomplete voir dire—ineffective assistance*** In proposition of law V, Adams asserts that his counsel provided ineffective assistance by conducting an incomplete voir dire examination of prospective jurors. As we noted, reversal of a conviction or sentence based on ineffective assistance requires finding both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 60} We reject this claim for several reasons. First, Adams has not shown deficient performance by counsel during voir dire. In fact, defense counsel, along with the court and prosecutor, conducted an extensive voir dire for 11 days. Voir dire eliminated those who were biased and those who would not be fair jurors in a death-penalty case.

{¶ 61} Nonetheless, Adams argues that his counsel did not adequately question jurors Eucker, Jagiella, and Griffin about their death-penalty views. But "[t]he conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. Accord *State v. Seiber* (1990), 56 Ohio St.3d 4, 12, 564 N.E.2d 408. We "will not second-guess trial strategy decisions" such as those made during voir dire. *State v. Mason*, 82 Ohio St.3d at 157, 694 N.E.2d 932.

{¶ 62} In fact, the court and counsel fully questioned these particular jurors about their death-penalty views. For example, the death-qualification voir dire for Eucker took over 30 pages of transcript. Eucker expressed "no problem" with the death penalty, thought that it "has a place in our society," but had "never given [it] a lot of thought." He understood that taking a life does not automatically result in the death penalty, and he was open to both the death penalty and life imprisonment. He would do only "what the law and the evidence requires" and would "listen to the instructions and set aside [his] own personal opinions." He would decide on death only if the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Defense counsel did not challenge Eucker for cause.

{¶ 63} Counsel and the court also extensively questioned Kenneth Griffin about his death-penalty views. Griffin believed that the death penalty was "there for a reason." But when asked if he had strong views, he responded, "No, not really." As possible mitigating factors, Griffin mentioned mental problems or the influence of drugs or alcohol. He agreed to follow the court's instructions, and believed that "if the mitigating factors * * * outweigh the aggravating circumstances, then that is where the sentencing should be." He would not "automatically head for a death penalty" if the defendant was convicted. Again, neither side challenged this juror.

{¶ 64} Counsel and the court also extensively questioned Edward Jagiella. Jagiella believed that if it is proved "beyond a shadow of a doubt" that a person killed somebody "with malice," and "they're not mentally ill," that person "deserve[s] the death penalty." But Jagiella stated that he could set aside his opinions and follow the court's instructions. He agreed that society would be protected either by a killer's execution or by a life sentence. Jagiella agreed to consider all mitigating factors, including "Adams's character, the way he was brought up, and * * * [whether] he was mentally ill." He would "listen to all of the facts," consider the credibility of witnesses, and "reserve judgment on everything until everything is in." Again, neither counsel challenged Jagiella for cause.

{¶ 65} Adams also complains about counsel's voir dire of alternate juror Jamie Nezbeth. But Nezbeth never sat as a juror and was excused for unrelated reasons during the mitigation hearing.

{¶ 66} We conclude that the questioning of all jurors, including the three named by Adams, was thorough and meaningful. Thus, Adams has not shown deficient performance. Counsel "need not repeat questions about topics already covered by * * * opposing counsel, or the judge." *State v. Watson* (1991), 61 Ohio St.3d 1, 13, 572 N.E.2d 97. Further, "[c]ounsel were present for voir dire and could see and hear the jurors answer questions. [They] were in a much better position" to judge such issues. *State v. Bradley*, 42 Ohio St.3d at 143, 538 N.E.2d 373. We have previously rejected similar challenges to the manner in which counsel questioned jurors during voir dire. See, e.g., *State v. Goodwin* (1999), 84 Ohio St.3d 331, 335, 703 N.E.2d 1251 (counsel's decision "not to question jurors further" about their death-penalty views was an "exercise of their discretionary judgment"); *State v. Evans*, 63 Ohio St.3d at 247, 586 N.E.2d 1042 (ineffective assistance not established by the fact that counsel in general voir dire only briefly asked jurors about their attitude concerning the death penalty).

{¶ 67} Finally, Adams has not established that prejudice resulted from the manner in which counsel voir dired Eucker, Jagiella, and Griffin. To establish prejudice requires proving that "a reasonable probability [exists] that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Adams has not even attempted to demonstrate that more extensive questioning of Eucker, Griffin, and Jagiella would have created a "reasonable probability" of a different trial result. Accordingly, we reject proposition V.

{¶ 68} *Competence to stand trial* In proposition of law X, Adams argues that his counsel provided ineffective assistance by failing to adequately challenge at trial the competence of Adams to stand trial when a good-faith basis existed to do so.

{¶ 69} Before trial, counsel requested a determination of competency. The court selected clinical psychologist Dr. Stanley J. Palumbo, the defense selected psychologist Dr. Douglas C. Darnall, and the prosecutor selected a psychiatrist, Dr. Steven J. Zuchowski. After interviewing Adams and examining relevant records, each expert found Adams competent to stand trial. At a pretrial conference, the parties stipulated to the competency-evaluation reports and agreed that each expert would testify as his report indicated. The court then found Adams competent to stand trial.

{¶ 70} Admittedly, a person who "lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri* (1975), 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103. "Fundamental principles of due process" prohibit trial of a criminal defendant who is legally incompetent. *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, citing *Pate v. Robinson* (1966), 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815.

{¶ 71} Although Adams suggests that he was not competent to stand trial, he primarily argues that his counsel provided ineffective assistance by not pursuing the issue. Nonetheless, we find that Adams has not established deficient performance. Counsel's decision to stipulate to the content of three competency evaluations and not cross-examine these experts or otherwise challenge the competence of Adams was grounded on a reasoned tactical judgment.

{¶ 72} First, the record reflects no basis to challenge the reports. The competency reports were comprehensive and satisfied the statutory requirements for competency evaluations. See R.C. 2945.371(G). Each expert explained in detail why Adams was competent to stand trial. For example, Dr. Palumbo interviewed Adams for two hours and reviewed other relevant records such as his own September 1996 evaluation of Adams. After reviewing relevant history, Dr. Palumbo articulated detailed reasons for concluding, "with reasonable scientific certainty, [that] Stanley Adams is presently able to understand the nature and objective of the proceedings against him and to presently assist in his defense." According to Dr. Palumbo, Adams understood and described the charges against him, the role of witnesses, the judge, the jury, the prosecutor, and the defense counsel, as well as his role as the defendant. Adams also understood types of pleas, the plea-bargain process, and the potential penalties.

{¶ 73} Dr. Darnall, the expert selected by Adams, also explained in detail why he could "find no evidence of a significant mental disorder that would hinder [Adams's] capacity to understand the judicial process or to contribute to his own defense." Dr. Zuchowski detailed five reasons why he found that Adams understood the nature and objective of the proceedings against him and eight specific reasons why Adams could assist his lawyers. Although all three experts

reported that Adams had abused drugs and alcohol, no one diagnosed any psychosis or mental limitations that would affect the competence of Adams to stand trial.

{¶ 74} Under R.C. 2945.37(G), "[a] defendant is presumed to be competent to stand trial." This presumption remains valid under R.C. 2945.37(G) unless "after a hearing, the court finds by a preponderance of the evidence" that the defendant is not competent. Faced with these strong conclusions that Adams was competent to be tried, counsel reasonably decided to stipulate to their testimony and not challenge the presumption of competency. When judging professional decisions of counsel, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 75} Second, counsel knew their client and could best determine if he understood the trial process and was able to assist them in the defense. Counsel could also decide if cross-examination of the experts or further evaluations were needed. See *State v. Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, at ¶ 63; *State v. Spivey* (1998), 81 Ohio St.3d 405, 410–411, 692 N.E.2d 151. We grant deference on these issues to those "who see and hear what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

{¶ 76} Third, later events at trial vindicated counsel's decision not to challenge the competence of Adams. During the trial, Adams made a pro se request for witnesses to be recalled, personally asked for an additional DNA test, and argued about a polygraph examination. These personal requests by Adams demonstrated his understanding of the trial process and his ability to assist his defense. In addition, the fact that Adams at times complained about tactical decisions that his lawyers made also established that Adams understood the trial process and was fully engaged in his defense.

{¶ 77} Further, Adams "displayed no outrageous, irrational behavior during trial, and counsel never complained about his lack of cooperation." *State v. Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, at ¶ 63. "[I]t is noteworthy that *nobody* on the spot thought [that the defendant's] behavior raised any question as to his competence." (Emphasis sic.) *State v. Cowans,* 87 Ohio St.3d at 84, 717 N.E.2d 298. Cf. *State v. Thomas,* 97 Ohio St.3d 309, 316, 779 N.E.2d 1017; *State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 29–32; *State v. Carter* (2000), 89 Ohio St.3d 593, 603–605, 734 N.E.2d 345.

{¶ 78} Finally, nothing in the record suggests prejudice, which *Strickland* requires. The record fails to reflect any reasonable probability that if counsel had cross-examined the experts or requested further evaluations, the trial court's decision that Adams was competent would have been different. See *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

Accord *State v. Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, at ¶ 66. Thus, we overrule proposition X.

## Trial issues

{¶ 79} ***DNA evidence*** In proposition of law II, Adams challenges the DNA evidence by claiming that the trial court's admission of scientific or expert testimony and evidence without a preliminary determination of the reliability of the conclusions to be presented violated his fair-trial rights. Adams complains that "the trial court regarded DNA [evidence] as nothing novel" and allowed "junk" testimony to come into evidence. Adams essentially challenges DNA testimony as if trial courts had never accepted DNA evidence before. See Evid.R. 702(C); *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 589–590, 113 S.Ct. 2786, 125 L.Ed.2d 469.

{¶ 80} However, we hold that the trial court was not required to conduct a preliminary hearing under Evid.R. 104 to accept the scientific reliability of DNA evidence. DNA evidence is not "novel" to Ohio courts as Adams claims. In *State v. Pierce* (1992), 64 Ohio St.3d 490, 597 N.E.2d 107, at paragraph one of the syllabus, we held that "DNA evidence may be relevant evidence which will assist the trier of fact in determining a fact in issue, and may be admissible." In *Pierce,* we recognized that "the theory and procedures used in DNA typing are generally accepted within the scientific community." 64 Ohio St.3d at 497, 597 N.E.2d 107. Further, we held in *Pierce* that "questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility. *No pretrial evidentiary hearing is necessary to determine the reliability of the DNA evidence.* The trier of fact * * * can determine whether DNA evidence is reliable." *Pierce,* 64 Ohio St.3d at 501, 597 N.E.2d 107. (Emphasis added.) Accord *State v. Nicholas* (1993), 66 Ohio St.3d 431, 437, 613 N.E.2d 225 ("DNA results constitute reliable evidence").

{¶ 81} To support his claims, Adams cites a variety of studies suggesting limitations on DNA evidence. For example, Adams argues that the court should have excluded DNA evidence because of controversy over (1) "the statistical estimates being offered for Polymerase Chain Reaction (PCR) tests"; (2) "the reliability of the methods used * * * for collecting, handling, processing, and testing crime scene samples"; and (3) "coincidental match probabilities and false error rates."

{¶ 82} However, the issues that Adams now raises "go to the weight of the evidence rather than its admissibility." *Pierce,* 64 Ohio St.3d 490, 597 N.E.2d 107, paragraph two of the syllabus. In *Pierce,* we found that the trial court properly admitted calculations as to the frequency probability of DNA samples. Id. at 501, 597 N.E.2d 107. In *Pierce,* we also recognized that "[g]iven the human element involved in their design and process, all scientific procedures and

analyses have incidents of error." Id. at 498, 597 N.E.2d 107. Further, "[t]he jury was free to reject the DNA evidence if it concluded that the evidence was unreliable or misleading." Id. at 501, 597 N.E.2d 107.

{¶ 83} Although Evid.R. 702 was amended after *Pierce* to state the reliability requirement, the Staff Note to Evid.R. 702 indicates that "[t]he amendment is intended to clarify the circumstances in which expert testimony is admissible. * * * [N]o substantive change from prior law is intended. In particular, there is no intention to change existing Ohio law regarding the reliability of expert testimony."

{¶ 84} Further, we have recognized since Evid.R. 702 was amended that "[r]elevant evidence based on valid principles will satisfy the threshold reliability standard for the admission of expert testimony. The credibility to be afforded these principles and the expert's conclusions remain[s] a matter for the trier of fact. The reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth." *State v. Nemeth* (1998), 82 Ohio St.3d 202, 211, 694 N.E.2d 1332.

{¶ 85} In *Miller v. Bike Athletic Co.* (1998), 80 Ohio St.3d 607, 611, 687 N.E.2d 735, we also emphasized that the reliability inquiry relates to the validity of the underlying scientific principles, not the correctness of the expert's conclusions. See, also, Gerald J. Todaro, The Admissibility of Medical Testimony in Ohio: *Daubert, Joiner* and Ohio's Relevance–Reliability Standard (1998), 46 Cleve. St.L.Rev. 319, 335 (*Nemeth* "ultimately continues the relaxed standard imposed by the relevance/reliability approach").

{¶ 86} As we recognized in *Pierce* over 12 years ago, DNA evidence, premised on valid scientific principles, has been widely accepted as reliable and admissible evidence. *Pierce,* 64 Ohio St.3d at 494, 597 N.E.2d 107. "[T]he use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade." *United States v. Beverly* (C.A.6, 2004), 369 F.3d 516, 528. Courts throughout the nation and in Ohio routinely accept DNA evidence. See George Bundy Smith & Janet A. Gordon, The Admission of DNA Evidence in State and Federal Courts (1997), 65 Fordham L.Rev. 2465, 2482–2483, 2488. See, also, *State v. Satta,* Marion App. No. 9–01–38, 2002-Ohio-5049, 2002 WL 31114690, ¶ 44 ("the credibility of the D.N.A. testing * * * is a matter to [be] determined by the trier of fact"); *State v. Martin* (Aug. 14, 2000), Brown App. No. CA99–09–026, 2000 WL 1145465 ("Questions regarding the reliability of DNA evidence * * *, including alleged defects or limitations of DNA population frequency statistics, go to weight of the evidence rather than its admissibility"); *State v. Honzu* (June 1, 1995), Franklin App. No. 94AP07–1011, 1995 WL 326214, * 8 (questions regarding DNA testing procedures go to weight

not admissibility). See, also, Smith & Gordon, 65 Cleve.St.L.Rev. at 2470 (PCR analysis [one of several DNA typing techniques] "has received overwhelming acceptance in the scientific community and the courts").

{¶ 87} At trial, Adams offered no evidence challenging the DNA evidence or the manner in which the samples were collected or tested, preferring to rely upon cross-examination of the experts. Although counsel cross-examined the experts at length, counsel did not establish any basis to question the admissibility or the reliability of the DNA evidence in this case. Moreover, counsel for Adams specifically asserted that for strategic reasons, they did not want additional DNA testing because it would not help their client.

{¶ 88} Finally, as we have long recognized, the admission of expert testimony is within the trial court's discretion. *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444. In this case, the trial court did not abuse its discretion by allowing the DNA experts to testify as such during the trial. Each expert was qualified under Evid.R. 702, and each explained the scientific procedures used. Meghan Clement holds a master's degree in forensic science, had performed thousands of DNA tests, and had testified over 200 times in courts in 24 states. Dr. P. Michael Conneally, a Distinguished Professor of Medical and Molecular Genetics, is a charter member of HUGO, the Human Genome Organization, had published 275 scientific articles, and had testified as an expert witness in 26 states on genetics and DNA subjects. Jennifer Duvall has a bachelor of science degree in biology, had completed an eight-month Ohio DNA training program, had completed analyses of over 1,000 DNA samples, and had testified as an expert witness 15 times. We find no merit in the claim made by Adams that the trial court erred in failing to hold a preliminary hearing on the admissibility of DNA evidence. Hence, we reject proposition II.

{¶ 89} ***Conviction of allied offenses*** In proposition of law VI, Adams argues that his separate convictions for kidnapping and rape constituted "allied offenses of similar import" under R.C. 2941.25. Adams argues that no separate animus existed for kidnapping and that he cannot constitutionally be convicted and sentenced separately for these two offenses. Trial counsel preserved the issue by raising the lack of proof of a separate animus for kidnapping in a Crim.R. 29 motion at trial.

{¶ 90} In *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, we established guidelines to determine whether kidnapping and rape are committed with a separate animus so as to permit separate punishment under R.C. 2941.25(B). We held in *Logan* that "[w]here the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substan-

tial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions." Id. at paragraph (a) of the syllabus. Conversely, the *Logan* court recognized that where the asportation or restraint "subjects the victim to a substantial increase in risk of harm separate and apart from * * * the underlying crime, there exists a separate animus." Id., 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, at paragraph (b) of the syllabus. In *Logan*, we also noted that where murder is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense. Id. at 135, 14 O.O.3d 373, 397 N.E.2d 1345.

{¶ 91} In *Logan*, we found no separate animus to sustain separate convictions for rape and kidnapping. In *Logan*, after the victim refused to accept some pills, the "defendant produced a knife, held it to her throat, and forced her into an alley. Under such duress, she accompanied him down the alley, around a corner, and down a flight of stairs, where he raped her at knifepoint." Id. at 127, 397 N.E.2d 1345, 14 O.O.3d 373. In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 197, 15 OBR 311, 473 N.E.2d 264, citing *Logan*, we found that charging two aggravating circumstances under R.C. 2929.04(A)(7) (robbery and kidnapping) was "unnecessarily cumulative." In the course of a bank robbery, Jenkins aimed his firearm at certain individuals and ordered others in the bank to move to the rear of the building, but "such restraint or movement of the victims was incidental" to the robbery. Id. at 198, 15 OBR 311, 473 N.E.2d 264.

{¶ 92} We have found that a separate animus existed, pursuant to *Logan*, in a variety of kidnapping and aggravated murder cases. In *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 135, the defendant *lured* the six-year-old victim into his apartment and kept her there long enough to show her some videos before raping and killing her. In *State v. Hartman* (2001), 93 Ohio St.3d 274, 280–281, 754 N.E.2d 1150, "the [d]efendant tied [the victim] to the bed, gagged her, stabbed her one hundred thirty-eight times, slit her throat, and strangled her to death." In *State v. Simko* (1994), 71 Ohio St.3d 483, 489, 644 N.E.2d 345, the defendant "restrained and terrorized" the victim for approximately one-half hour before shooting her when she tried to escape. In *State v. Hill* (1992), 64 Ohio St.3d 313, 595 N.E.2d 884, the defendant forced the 12–year-old victim from a parking lot to a secluded, wooded area, where the victim was repeatedly beaten, raped, and then strangled and set on fire. See, also, *State v. Seiber*, 56 Ohio St.3d 4, 564 N.E.2d 408 (kidnapping found when defendant and accomplice terrorized and held bar patrons at gunpoint for 20 to 30 minutes, preventing them from leaving); *State v. Powell* (1990), 49 Ohio St.3d 255, 261–262, 552 N.E.2d 191 (kidnapping upheld when defendant lured a child from her home to fourth floor of nearby building where he attempted to rape her and ultimately killed her by throwing her from the window).

{¶ 93} Nonetheless, each of the foregoing cases is distinguishable from this case. In contrast to the facts established in those cases, the state presented no evidence in this case that Adams moved Ashley to or from the bedroom where she was killed or that he tied her up or restrained her in any way other than what was necessary to rape and kill her. No evidence exists in the record of substantial movement, prolonged restraint, or secretive confinement. *Logan*, 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, at syllabus. In fact, no evidence exists that Ashley was moved at all. Nor did a "kidnapping in facilitation" of a murder occur. *Logan*, 60 Ohio St.2d at 135, 14 O.O.3d 373, 397 N.E.2d 1345. Further, the evidence indicates that Adams was in the house no more than 30 minutes. The pathologist reported that the attack on Ashley and Esther "could have happened very quickly," "in a matter of minutes."

{¶ 94} In sum, we hold that the evidence is insufficient, under *Logan*, to establish the separate animus required to separately convict Adams for kidnapping Ashley. See *State v. Donald* (1979), 57 Ohio St.2d 73, 11 O.O.3d 242, 386 N.E.2d 1341, syllabus (kidnapping is an offense of similar import to rape); *Logan*; *Jenkins*; *State v. Fears* (1999), 86 Ohio St.3d 329, 344, 715 N.E.2d 136 (no separate animus for death-penalty specifications alleging robbery and kidnapping without prolonged restraint, significant asportation, or secret confinement).

{¶ 95} Accordingly, the conviction for kidnapping in Count 5, as well as the findings of guilty to the R.C. 2929.04(A)(7) specifications for murder during a kidnapping in Count 1 and Count 3, is vacated. Count 5 and those specifications are dismissed. The separate sentence for count 5 is set aside.

{¶ 96} ***Jury Instructions*** In proposition of law XI, Adams argues that the trial court erred by referring to "Ashley Dawn Cook, Age 12," in the instructions on Count 2 and in death-penalty specification 7 in Counts 1 and 2. Adams points out that Ashley's age was an element of these offenses and an issue of fact for the jury. Her age was also relevant as an issue of fact in Count 5.

{¶ 97} Due process requires the state to prove beyond a reasonable doubt every element of the charged offense. *In re Winship* (1970), 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368. Jury instructions that effectively relieve the state of its burden of persuasion violate a defendant's due process rights. *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39; *Rose v. Clark* (1986), 478 U.S. 570, 580, 106 S.Ct. 3101, 92 L.Ed.2d 460.

{¶ 98} In this case, the trial court's initial trial-phase instructions, which concerned Counts 5 through 8, the kidnapping and rape charges, did not list Ashley's age as 12 years. For those charges, the court instructed that whether Ashley was "under 13 years of age" or "under the age of 13" was an issue of fact for the jury. Adams does not complain about that part of the instructions.

{¶ 99} Later, the court instructed the jury on the elements of death-penalty specification 7, murder of a child under 13 in violation of R.C. 2929.04(A)(9), in Counts 1 and 2. On those specifications, the court instructed the jury that to "find the Defendant guilty * * * you must find that the State has proven beyond a reasonable doubt that the Defendant * * * did purposely cause the death of Ashley Dawn Cook, age 12, who was under 13 years of age at the time of the [murder]." Adams now argues that the trial judge in effect instructed the jury that Ashley was in fact 12 years old, when the jury had the responsibility to make a finding of fact on that issue.

{¶ 100} Nonetheless, we conclude that Adams waived this claim by not objecting in a timely manner to any ambiguity in the instruction relating to Ashley's age. See *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. In this case, the objection was not timely. Counsel had received the instructions and verdict forms two days previously, but counsel did not raise any objection until after the jury was instructed. Untimely objections are reviewed "using a plain-error analysis pursuant to Crim.R. 52(B)." *State v. Johnson* (1989), 46 Ohio St.3d 96, 102, 545 N.E.2d 636.

{¶ 101} Further, we conclude that the instruction did not foreclose the jury's role. The reference to Ashley as "age 12" came in the context of the trial court's instructions to the jury as to the charge as stated in the indictment. The court then properly instructed the jury that the state had to prove the victim's age. When considered in the context of the entire instructions, the jury would not have understood the instruction as requiring it to accept that Ashley was 12 years old, without making the required factual finding. See *Estelle v. McGuire* (1991), 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385.

{¶ 102} At worst, the instruction was ambiguous and did not constitute plain error, because the outcome of the trial was not affected by the reference to Ashley's age. *State v. Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Compelling evidence, including Ashley's death certificate, as well as testimony at trial, proved that Ashley was 12 years old when she was murdered. No evidence at trial contradicted that fact. Accordingly, we regard the issue raised in proposition XI waived.

{¶ 103} ***Restraints during trial*** In proposition of law XII, Adams argues that the trial court improperly authorized the use of an electronic restraint on him, a "Band–It" belt that could be activated to produce an electric shock if Adams was disruptive in court. Adams argues that the trial court violated his right to a fair trial because the court authorized fitting the device on him without a factual basis for doing so.

{¶ 104} With respect to customary physical restraints such as handcuffs or leg shackles, we have long recognized that "no one should be tried while shackled,

absent unusual circumstances." *State v. Kidder* (1987), 32 Ohio St.3d 279, 285, 513 N.E.2d 311. "However, shackling is left to the trial court's sound discretion." *State v. Richey* (1992), 64 Ohio St.3d 353, 358, 595 N.E.2d 915, citing *State v. Woodards* (1966), 6 Ohio St.2d 14, 23, 35 O.O.2d 8, 215 N.E.2d 568. The trial court must exercise its own discretion and not leave the issue up to security personnel. See, e.g., *Woodards v. Cardwell* (C.A.6, 1970), 430 F.2d 978, 981–982. Accord *State v. Cassano,* 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 54. Courts have upheld restraints in trials of defendants with a documented history of violence or escape attempts. See, e.g., *Harrell v. Israel* (C.A.7, 1982), 672 F.2d 632, 636; *Kennedy v. Cardwell* (C.A.6, 1973), 487 F.2d 101, 105, fn. 5.

{¶ 105} Courts elsewhere have upheld the use of electronic stun belts when specifically justified. See, e.g., *State v. Powell* (2002), 274 Kan. 618, 56 P.3d 189 (factors justifying use include serious nature of charges, history of institutional violence, history of verbal or physical assaults); *United States v. McKissick* (C.A.10, 2000), 204 F.3d 1282, 1299 (without evidence that jury knew that defendants were wearing stun belts, court will not presume prejudice). Accord *Scieszka v. State* (2003), 259 Ga.App. 486, 578 S.E.2d 149 (where no prejudice is shown, use of stun belt not abuse of discretion); *Simms v. State* (Tex.App.2004), 127 S.W.3d 924. Other courts have reversed when stun belts have not been amply justified on the record. See, e.g., *Gonzalez v. Pliler* (C.A.9, 2003), 341 F.3d 897; *People v. Mar* (2002), 28 Cal.4th 1201, 124 Cal.Rptr.2d 161, 52 P.3d 95; *United States v. Durham* (C.A.11, 2002), 287 F.3d 1297. Further, the Supreme Court of Indiana has flatly declared that "stun belts may not be used on defendants in the courtrooms of this State." *Wrinkles v. State* (Ind.2001), 749 N.E.2d 1179, 1194. In Ohio, this device has been used previously in some capital cases. See, e.g., *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 238, 714 N.E.2d 867.

{¶ 106} In this case, the trial court conducted a hearing on September 6, 2001, and heard arguments of counsel and statements from security personnel before authorizing the use of this security device. Further, the record shows that the trial court had a factual basis for authorizing the device.

{¶ 107} First, Chief Deputy Cook of the Sheriff's Office explained, at the hearing, that the Band–It device would produce an electric shock only "if the Defendant embarks on an escape attempt, an assault, or other violent behavior." Further, Cook explained that the device is "non-lethal, it's short-term and it incapacitates." There is also "an audible alert tone that actually tells the Defendant it's going to go off, so he's got some discretion on whether to pull back." The trial court noted that it "does absolutely zero harm" when not activated. Although Adams suffers from epilepsy, no medical evidence indicated that he was at additional risk if the device was activated. Nor did evidence establish that his ability to assist counsel was impaired.

{¶ 108} Second, because Adams was wearing clothing over the device, the device was not visible to the jury and, unless it was activated, the jury would not know that it was being worn. The record does not reflect that it was activated in this trial. In contrast, leg irons or shackles always present a risk that jurors will inadvertently discover the restraints and possibly be influenced in deliberations. See, e.g., *Illinois v. Allen* (1970), 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353. In this case, the jury learned about the device only when Adams personally complained about having to wear it when he made an unsworn statement during the penalty phase.

{¶ 109} Third, the trial court explained its decision to authorize the Band–It device in an entry. The court explained that in November 2000, Adams had been convicted of an unrelated murder and rape and had been sentenced to 25 years to life. Adams also had a "lengthy criminal record and [had] been imprisoned on at least four (4) prior occasions." The trial court found that based on jail reports, Adams "may pose a risk of escape." Also, according to Dr. Darnall, Adams had "difficulty in adequately controlling his frustration and anger." Adams told Dr. Darnall, "[I]f I get close to it, I am gonna sucker [punch] them [his previous attorneys]. * * * I am going to get the satisfaction and knock the f* * *ing shit out of him." According to Dr. Zuchowski, Adams could control his behavior, but "his personality traits, particularly impulsivity and irritability, make courtroom outbursts a possibility."

{¶ 110} On the foregoing basis, we conclude that the trial court did not abuse its discretion in authorizing this device to be used on Adams during his trial. Cf. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 81 (defendant's past violent behavior and psychologist's description of him as a "time bomb" justified shackling in penalty phase); *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 55 (convicted violent felon, murder occurred in prison). Accordingly, we overrule proposition XII.

{¶ 111} *Gruesome photographs* In proposition of law XVI, Adams argues that the trial court's decision to admit certain "shocking and gruesome" photographs deprived him of a fair trial.

{¶ 112} In capital cases, nonrepetitive photographs, even if gruesome, are admissible if relevant, as long as the probative value of each photograph outweighs the danger of material prejudice to an accused. *State v. Maurer*, 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916; *State v. Maurer*, 15 Ohio St.3d at 264, 15 OBR 379, 473 N.E.2d 768.

{¶ 113} As to many photographs and slides that Adams now complains about, he did not object at trial and thus waived all but plain error. No outcome-determinative plain error resulted from the admission of these exhibits because they portray relevant subjects and were of probative value.

{¶ 114} As to crime-scene photographs to which an objection was made, the trial court did not abuse its discretion in admitting these exhibits. Several prosecution exhibits are four-inch-by-six-inch crime-scene photographs of the victims. One exhibit portrays the head and neck injuries that Esther suffered, and other exhibits, taken from different angles, portray the injuries to Ashley, her posed body, and the body's relationship to the surroundings.

{¶ 115} The photographs were limited in number and noncumulative, and each had substantial probative value. For example, these photographs illustrated the testimony of detectives who described the crime scene and helped to establish the killer's intent. See *State v. Goodwin*, 84 Ohio St.3d at 342, 703 N.E.2d 1251; *State v. Mason*, 82 Ohio St.3d at 158, 694 N.E.2d 932. These photographs also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans*, 63 Ohio St.3d at 251, 586 N.E.2d 1042. In other cases involving even more-gruesome photographs, the court has found no abuse of discretion. See, e.g., *State v. Smith* (1997), 80 Ohio St.3d 89, 108–109, 684 N.E.2d 668; *State v. Biros* (1997), 78 Ohio St.3d 426, 443, 678 N.E.2d 891.

{¶ 116} The trial court did not abuse its discretion by admitting photographs of the victims when they were alive. Adams has failed to demonstrate any prejudice resulting from the admission of these photographs.

{¶ 117} Nor did the trial court abuse its discretion in admitting many slides that the pathologist used to illustrate his testimony. Some slides were crime-scene views that illustrated the pathologist's description of the crime scene, portrayed the victims and their injuries in relation to the surroundings, helped to establish the killer's intentions, and corroborated testimony of detectives. A few did not portray bodies and hence were not gruesome. Other slides taken during the autopsy exactly portray Ashley's injuries, and their admission did not constitute an abuse of discretion. Other slides depict Esther's different injuries. Cf. *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, at ¶ 32–37; *State v. Hartman*, 93 Ohio St.3d at 289, 754 N.E.2d 1150. Thus, we reject proposition XVI.

{¶ 118} *Cumulative error* In proposition of law XVII, Adams argues that the cumulative effect of errors during his trial denied him due process and a fair trial. However, we have rejected Adams's claims of error as explained in connection with other propositions. See our discussion on voir dire (III, V), refusal to change venue (IV), the admission of DNA evidence (II), and restraints during

trial (XII). The trial court adequately protected the fair-trial and due-process rights of Adams.

{¶ 119} Nor did the prosecutor commit misconduct, as Adams suggests, when the pathologist displayed, for demonstrative purposes, an exhibit, which was not admitted, of the type of weapon that may have caused Esther's injuries. The prosecutor did not err by presenting evidence as to french fries found in Adams's car. That fact related to other evidence in the case indicating that Ashley had eaten french fries before her death. Evidence that a steak knife was found in the Chevy Cavalier was inconsequential.

{¶ 120} We find that multiple errors did not occur in this case. See *State v. Madrigal*, 87 Ohio St.3d at 397–398, 721 N.E.2d 52; *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623. In our view, the failure to prove a separate animus as to the kidnapping did not affect the other convictions. See discussion on proposition VI. We find no other errors that prejudiced the substantial rights of Adams. Hence, we reject proposition XVII.

## Penalty issues

{¶ 121} ***Duplicative aggravating circumstances*** In proposition of law VII, Adams asserts that his rights were violated because duplicative death specifications were submitted for the jury to weigh and consider against mitigation evidence.

{¶ 122} Duplicative death-penalty specifications should be merged when they "arise from the same act or indivisible course of conduct." *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. However, when the offenses illustrate a separate animus and do not show an indivisible course of conduct, merger is not required. See, e.g., *State v. Robb* (2000), 88 Ohio St.3d 59, 85, 723 N.E.2d 1019 (court need not merge 2929.04[A][4], [A][5] or [A][7] specifications); *State v. Williams* (1996), 74 Ohio St.3d 569, 579, 660 N.E.2d 724 (offenses in [A][7] and [A][5] death specifications are not duplicative in that case).

{¶ 123} As we have discussed in connection with proposition VI, no separate animus existed as to the asserted kidnapping of Ashley, and we have vacated the findings of guilt as to the death-penalty kidnapping specifications in Counts 1 and 3. We will consider that failure of proof in our independent assessment of the penalty. See *State v. Mitts* (1998), 81 Ohio St.3d 223, 232, 690 N.E.2d 522; *State v. Garner*, 74 Ohio St.3d at 53, 656 N.E.2d 623; *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70.

{¶ 124} In other particulars, however, we conclude that Adams's complaint about duplicative death-penalty specifications lacks merit. First, counsel failed to

object and thus waived the issue. *State v. Underwood,* 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 125} Second, the specifications were not duplicative for punishment purposes, and counsel were not ineffective for not raising the issue. Murder while committing a felony, such as aggravated burglary, R.C. 2929.04(A)(7), and during a course of conduct of purposeful killing, R.C. 2929.04(A)(5), as charged in Count 1 and Count 3, are not duplicative. See, e.g., *State v. Smith,* 80 Ohio St.3d at 116, 684 N.E.2d 668; *State v. Williams,* 74 Ohio St.3d at 579, 660 N.E.2d 724.

{¶ 126} Third, murder of a person specifically protected because of status, such as a child, is not duplicative of other death specifications. See *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 199–200 ("course of conduct," [A][5], and murder of police officer, [A][6], are not duplicative); *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 141 (death of a child, [A][9], is not duplicative of [A][3] or [A][7] ). Further, rape by fellatio and vaginal rape are separate offenses under R.C. 2941.25(B), even when one is "followed immediately by" the other. *State v. Barnes* (1981), 68 Ohio St.2d 13, 14, 22 O.O.3d 126, 427 N.E.2d 517. Accord *State v. Jones* (1997), 78 Ohio St.3d 12, 676 N.E.2d 80.

{¶ 127} *Ineffective assistance on penalty-phase jury instructions* In proposition of law VIII, Adams argues that his counsel provided ineffective assistance by not requesting "fact-specific mitigation instructions" that would elaborate on "other factors" specified in R.C. 2929.04(B)(7).

{¶ 128} However, counsel's decision not to request the trial court to explain how the evidence relates to mitigating "other factors" does not reflect deficient performance. Counsel may have believed that doing so would limit his argument, and thus his decision "falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, the trial court need not explain or elaborate on "other factors" in instructions. *State v. Landrum,* 53 Ohio St.3d at 122, 559 N.E.2d 710: *State v. Robb,* 88 Ohio St.3d at 84–85, 723 N.E.2d 1019. The trial court, by referring to "other factors" in the instructions, never "precluded [the jury] from considering any evidence as mitigating." *State v. Mitts,* 81 Ohio St.3d at 234, 690 N.E.2d 522.

{¶ 129} Second, Adams has not established prejudice from the absence of such an instruction. Thus, Adams has not provided any basis to believe that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Accordingly, we reject proposition VIII.

## Settled issues

{¶ 130} *Constitutionality* We summarily reject proposition IX, which argues that Adams's counsel provided ineffective assistance by not filing pretrial motions challenging the constitutionality of the death penalty. See *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, 715 N.E.2d 1144; *State v. Davis* (1991), 62 Ohio St.3d 326, 349, 581 N.E.2d 1362. See, also, *State v. Carter*, 89 Ohio St.3d at 607, 734 N.E.2d 345; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

{¶ 131} *Lethal injection* In proposition of law XIII, Adams challenges the constitutionality of lethal injection to carry out the death penalty. However, we have previously rejected similar arguments. See *State v. Carter*, 89 Ohio St.3d at 608, 734 N.E.2d 345. Adams's challenge to electrocution is moot because Ohio law no longer authorizes electrocution to carry out the death penalty. See R.C. 2949.22.

{¶ 132} *Peremptory challenges* We summarily reject proposition XIV, which argues that Adams was entitled to 12 peremptory challenges. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, at ¶ 66–67; *State v. Greer* (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, paragraph two of the syllabus.

{¶ 133} *Reference to jury recommendation* In proposition of law XV, Adams complains that the trial court's reference to the jury verdict as a recommendation, over his objection, affected the reliability of the jury's verdict. In fact, the trial court never used the term "recommendation," and the use of the term in the verdict forms accurately reflected Ohio law, did not diminish the jury's sense of its sentencing responsibility, and did not constitute error. We summarily reject proposition XV. *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 102; *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 656 N.E.2d 643.

## INDEPENDENT SENTENCE EVALUATION

{¶ 134} *Penalty-phase evidence* At the penalty phase, Adams presented testimony about his history and background from a psychologist, a psychiatrist, his former girlfriend, and his brother.

{¶ 135} Dr. Sandra McPherson, a psychologist, interviewed Adams, consulted others, and examined various records relating to Adams. According to Dr. McPherson, Adams's IQ is 77, or in the low average to borderline range and in the lowest 12 percent of the population. His personality test suggests "significant maladjustment," and Adams has a "personality disorder not otherwise specified." He is depressed and periodically suicidal. Adams started drinking at

age five or six and has "been involved with multiple substances, amphetamines, marijuana, [and] cocaine, as well as alcohol." Substance abuse has reduced his capacity for effective cognitive functioning.

{¶ 136} In his early life, Adams suffered from a chaotic upbringing. His father "was a brutal and seriously disturbed personality," who beat Adams's mother and his children regularly and sexually abused his sons and daughters. At one point, his father took the children and hid them for six months. Adams's history "is certainly at the worst end of * * * disruptive families." Adams was then raised in various foster homes. As an adult, Adams had a few paying jobs but was not regularly employed. He did odd jobs but primarily lived on social security.

{¶ 137} Dr. Steven Zuchowski, a psychiatrist, corroborated Dr. McPherson's evaluation and the fact that Adams suffered from a "personality disorder, not otherwise specified," with "borderline" and "anti-social" elements. Adams reportedly also suffered abuse in various foster homes. Adams does not have a mental disease or defect, and no medication or therapy is available to treat him. Adams declined to discuss with Dr. Zuchowski his drug abuse or the charged crimes.

{¶ 138} Jeffrey Adams, the defendant's older brother, confirmed details about the family and the chaotic upbringing that the nine Adams children had. Six siblings are still living. Jeffrey noted that their alcoholic father regularly beat their mother and the children and also raped several children, including Stanley.

{¶ 139} Loretta Stanford, a former girlfriend, lived with Adams for nine years, and they had two sons, Stanley, age 12, and William, age ten. When they lived together, Adams was not mean or abusive, but he used crack cocaine and drank too much. But Adams had a "very nice relationship" with his sons; they played baseball, rode minibikes, and went fishing. He loved them and they loved their father.

{¶ 140} In an unsworn statement, Adams complained about the Band–It electronic device he was forced to wear, advising the jury that he was "under a constant threat of being zapped." He also complained about the prosecutors and the trial, especially the DNA evidence, since he "didn't rape little Ashley, let alone kill her." He said he was sorry that the jury had found him guilty but that he was innocent and "could never, never take the life of anybody, especially a kid." Then he stated, "My son asked me to ask you not to kill his dad. Don't kill me, please."

{¶ 141} *Sentence evaluation* After independent assessment, we find that the evidence proves the aggravating circumstances of which Adams was convicted, i.e., murder as part of a "course of conduct involving the purposeful killing" of two or more persons, R.C. 2929.04(A)(5), and murder during an aggravated burglary, R.C. 2929.04(A)(7). As to Ashley, the evidence also proved the addi-

tional death specifications including murder during rape, both vaginal and fellatio, R.C. 2929.04(A)(7), and murder of a child under 13 years of age, R.C. 2929.04(A)(9). We have dismissed the murder-during-kidnapping specifications, R.C. 2929.04(A)(7), and will consider that fact during our independent reassessment of the sentence.

{¶ 142} As to mitigating factors, we find nothing in the nature and circumstances of the offenses to be mitigating. But we do find that the history and background of Adams provides mitigating features. Adams had a horrific upbringing and an extremely abusive father. Adams lacked the care and nurturing of a loving family while growing up and was raised in numerous foster homes. This factor undoubtedly contributed to his present and past difficulties. But we find nothing in his character to be mitigating.

{¶ 143} We find the following statutory mitigating factors not to be applicable: R.C. 2929.04(B)(1) ("victim inducement"); (B)(2) ("duress, coercion, or strong provocation"); (B)(3) ("mental disease or defect"); (B)(4) ("youth"); (B)(5) ("lack of criminal record"); and (B)(6) ("not the principal offender"). Adams was 33 years old at the time of the offenses.

{¶ 144} We regard as mitigating "other factors," R.C. 2929.04(B)(7), the fact that Adams has a psychological personality disorder and substance-abuse problems. The fact that Adams has children who love him is also a mitigating "other factor," but we find no other mitigating factor under R.C. 2929.04(B)(7).

{¶ 145} As to the aggravated murder of Esther Cook, we find beyond a reasonable doubt that the aggravating circumstances of murder during a burglary and as a course of conduct outweigh the mitigation presented in this case. Adams feloniously entered Esther's home and savagely and brutally beat her to death, and he did so as a part of a course of conduct involving Esther's murder and the murder of her 12–year–old daughter.

{¶ 146} When considering Ashley's murder, we also find beyond a reasonable doubt that the multiple aggravating circumstances, murder during a course of conduct, R.C. 2929.04(A)(5), and murder during a burglary and during rape, R.C. 2929.04(A)(7), as well as murder of a child, R.C. 2929.04(A)(9), outweigh the mitigating features that Adams presented. Adams chose to rape and murder an innocent 12–year–old child, who was the half-sister of his own girlfriend. His acts clearly demonstrate that the death penalty is appropriate.

{¶ 147} We find that the death penalty for the aggravated murder of Esther Cook and the death penalty for the aggravated murder of Ashley Cook are proportionate when compared with other "course of conduct" murders. See, e.g., *State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303; *State v. Braden,* 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439; *State v. Cornwell,* 86 Ohio St.3d 560, 715 N.E.2d 1144; *State v. Clemons* (1998), 82 Ohio St.3d 438, 696

N.E.2d 1009; *State v. Keith,* 79 Ohio St.3d 514, 684 N.E.2d 47; *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960; *State v. Allard* (1996), 75 Ohio St.3d 482, 663 N.E.2d 1277; and *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071. We find that the death sentence is also proportionate when compared with other cases involving "course of conduct" murders committed during a burglary. See, e.g., *State v. Hughbanks,* 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081; *State v. Hessler,* 90 Ohio St.3d 108, 734 N.E.2d 1237.

{¶ 148} Additionally, we find that the death penalty for the murder of Ashley is neither excessive nor disproportionate when compared with similar felony-murder cases involving rape of a child victim, implicating both R.C. 2929.04(A)(7) and (A)(9). See, e.g., *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185; *State v. Smith,* 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221.

{¶ 149} Accordingly, the conviction for kidnapping in Count 5, as well as the findings of guilty in counts 1 and 3 as to the R.C. 2929.04(A)(7) (murder during a kidnapping), are vacated, and Count 5 and those specifications are dismissed. Otherwise, the judgment of the trial court and the convictions, including the sentences of death, are affirmed.

Judgment accordingly.

RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DON-NELL, JJ., concur.

---

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos, Assistant Prosecuting Attorney, for appellee.

Mary Jane Stephens and John B. Juhasz, for appellant.