{¶ 1} Wayne Ervin ("Ervin") appeals from his conviction and sentence imposed in the Cuyahoga County Common Pleas Court. Ervin argues the trial court erred when it failed to grant a mistrial, failed to merge the aggravating circumstances at his sentencing hearing, improperly admitted prejudicial evidence, and deprived him of his right to a fair trial. For the following reasons, we affirm the decision of the trial court.
 {¶ 2} This appeal arose from the double homicide of Arman Lovett ("Lovett") and Jeff Burton ("Burton") and the attempted homicide of Carolyn Diane Pitts ("Pitts") on March 18, 2004. This incident occurred at a combination delicatessen/convenience store located at the corner of East 79th Street and Central Avenue in Cleveland, Ohio. The store owner, Lovett, his live-in girlfriend, Pitts, and *Page 2 
their employee-boarder Burton all were present on the premises. The five males involved were Ervin, Dwight "Fats" Whatley, Tywon Dubois, Dedrick Divens, and Daniel Grant.
 {¶ 3} Pitts worked that night at the store counter when she took a food order for a young man later identified as Daniel Grant ("Grant"). Pitts recognized Grant as a guy she had seen with a local drug dealer. Grant left the store after ordering his sandwich. A few minutes later, Grant returned with Dwight Whatley ("Whatley"). Pitts knew Whatley because she purchased drugs from him. Also with Grant and Whatley were Ervin, Tywon Dubois ("Dubois"), and Dedrick Divens ("Divens").
 {¶ 4} Pitts continued to make Grant's sandwich but stopped when she heard one of the men yell "everybody put your hands up." (Tr. 1628.) Pitts looked up and noticed that Ervin, Dubois and Divens had donned ski masks and that they, and Grant and Whatley all held guns in their hands. Whatley carried a shotgun.
 {¶ 5} The five men gathered Pitts, Lovett and Burton and forced the captives out to the patio area of the premises, where they each were laid on the ground to be bound hand and foot with duct tape. One of the males placed a coat over Pitts' head. Pitts heard some of the men running and heard them demanding the location of the keys and the combination to a safe. Whatley continued to urge Lovett to tell him where he kept all of his money. In an effort to get Lovett to talk, Whatley punched Lovett and fired his shotgun into the concrete floor. Pitts told Whatley that *Page 3 
Lovett did not have much money and begged for her life. Whatley replied without emotion that he had to kill her because she recognized him.
 {¶ 6} Eventually, the men removed all three victims to the basement of the residence. As they lay on the floor, one of the assailants wondered "what [they were] going to do with them?" (Tr. 1680.) Someone answered, "let's just do them." (Tr. 1680.) From under the coat that had been placed over her head, Pitts saw one of the masked men use a steak knife to slice Burton's throat. When that did not kill Burton, another man fired a bullet into his head. Lovett was also murdered with one shot in the head.
 {¶ 7} In an effort to protect herself, Pitts placed her hands over her head before her turn came. Although she felt a shot strike her, the bullet's force dissipated as it passed through her hands, the fabric of her coat and her skull. Pitts survived. She waited until she believed the men had gone before she rose and called the police. When the police arrived, Pitts told the officers that one of the men responsible for the incident was "Fats"; Pitts did not know Whatley's real name.
 {¶ 8} The police officers followed the fresh tracks that had been left in the snow that led to the backyard of a residence located at 2363 East 77th Street. Along the way, the officers found some of Lovett's papers and lesser valuables. In addition, underneath a van parked in the driveway of the residence, the officers recovered five weapons, one of which was a shotgun. Two of the recovered *Page 4 
handguns were later proven, respectively, to have fired the fatal shots into Lovett and Burton and to have fired the shot into Pitts' head.
 {¶ 9} At Ervin's trial, Joanna Workman ("Workman"), who lived at 2363 East 77th Street, testified that on the night of the incident, she admitted Grant and Dubois into her house. A short time later, Workman heard gunshots and then Whatley and another unidentified male came to her door. Workman later identified Ervin from a photo array and identified him in court as one of the men that came to her house that night. Workman demanded that all four men leave her residence. Divens met up with his four codefendants after they left Workman's residence.
 {¶ 10} Tyshaun Hampton ("Hampton") testified at trial that he met Ervin four or five years ago and that they were friends. On the night of the incident, Hampton received a call from Ervin asking Hampton to come to 2363 East 77th Street to give him a ride. When Hampton arrived, Ervin, along with his four codefendants were standing outside. The men placed a metal box into the trunk of Hampton's vehicle before he took them to another location. Hampton later watched as the men broke into the box, which contained approximately $3,500 in cash. Hampton believed that each of the men received approximately $700. Hampton subsequently drove the men to a place where they burned the clothing they had been wearing.
 {¶ 11} Dubois testified that he pled guilty in case number CR-451440 to two counts of murder and one count of attempted aggravated murder in exchange for his *Page 5 
agreement to fully cooperate with the prosecution of his codefendants. Dubois testified that on March 18, 2004, he went to James Chalklett's house where the four codefendants were already present. The five men met in the back bedroom where they smoked weed and talked about robbing Lovett's store. Whatley had a shotgun with him. Dubois corroborated Pitts' testimony about the incidents that occurred once the men entered Lovett's store.
 {¶ 12} On March 19, 2004, Federal Bureau of Investigation Agent Phillip Torsney ("Agent Torsney") testified that he arrested Ervin on an unrelated matter. At the time of his arrest, Ervin had $600 in his front pants pockets. Agent Torsney testified that he did not seize the money as evidence because at the time of Ervin's arrest, he was unaware of the murders that occurred the night before.
 {¶ 13} On August 4, 2005, a Cuyahoga County Grand Jury indicted Ervin with four counts of aggravated murder, two counts of attempted aggravated murder, two counts of aggravated burglary, six counts of aggravated robbery, and three counts of kidnapping.[1] All charges contained one-and three-year firearm specifications, while the aggravated murder charges contained mass murder specifications, felony murder specifications, and escape detection specifications. The parties conducted *Page 6 
extensive discovery and the court granted Ervin's motions for a court-appointed investigator, mitigation specialist, and psychologist.
 {¶ 14} On May 22, 2006, the case proceeded to a jury trial. On June 11, 2006, the jury returned guilty verdicts on all crimes charged. The jury found Ervin not guilty of the one-and three-year firearm specifications, but found him guilty of the mass murder, felony murder, and escape detection specifications. The jury concluded that Ervin was not the principal offender but did conclude that he acted with prior calculation and design.
 {¶ 15} The trial court commenced the mitigation phase on June 19, 2006. Ervin presented several family witnesses and the testimony of Doctor James Karpawich in furtherance of their theory that Ervin's drug use, low intellect, lack of family structure, and having convicted felons as immediate family members and role models left Ervin with no other future but the criminal path he chose. The testimony elicited by Ervin's witnesses established the following:
 {¶ 16} Ervin was born prematurely, the fourth of six children to a teenaged mother. Ervin's father was in prison for the first six years of his life, but moved in with the family after his release. After returning from prison, Ervin's father sold drugs out of the family's house. While Ervin was growing up, his older brothers also sold drugs in the neighborhood. *Page 7 
 {¶ 17} After Ervin's father had an affair, his mother moved away with some of her children but left Ervin with his father. Later, his mother moved back in but brought with her a boyfriend who had introduced her to crack cocaine. Ervin's mother would steal drugs out of her children's rooms and would often disappear for days at a time.
 {¶ 18} Ervin has an IQ of about 77, which is borderline between low average and mentally retarded. Ervin failed the first grade and later failed the seventh grade twice before dropping out of school. The forensic psychologist described him as a quiet, shy, loner who does not talk much to anyone but his mother and siblings. The psychologist testified that at the time of his trial, twenty-two-year-old Ervin did not know in which direction the sun rises each day, how many weeks are in a year, or the definition of simple words.
 {¶ 19} The family moved quite a bit as Ervin grew up, but usually stayed in the area of East 79th and Cedar and always lived on public assistance. Ervin's older brothers took care of him, buying him what he needed and paying the rent with money they made selling drugs. Ervin eventually learned to sell drugs from his older brothers.
 {¶ 20} After hearing all the mitigating and aggravating evidence, the jury recommended life without parole on each of the four aggravated murder counts. On July 5, 2006, the trial court sentenced Ervin to two terms of life in prison without the *Page 8 
possibility of parole to be served consecutively. In addition, the trial court sentenced Ervin to seventy years in prison for the crimes of attempted aggravated murder, aggravated burglary, aggravated robbery, and kidnapping. The trial court imposed a $20,000 fine and informed Ervin that he would be subjected to five years of postrelease control if he was ever released from prison.
 {¶ 21} Ervin appeals, raising the four assignments of error contained in the appendix to this opinion.
 {¶ 22} In his first assignment of error, Ervin argues that the trial court erred when it failed to grant his request for a mistrial. We disagree.
 {¶ 23} The standard of review for evaluating a trial judge's decision to grant or deny a mistrial is abuse of discretion. State v.Goerndt, Cuyahoga App. No. 88892, 2007-Ohio-4067. An abuse of discretion is more than an error of law or judgment; it implies the trial court's decision is unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore, (1983) 5 Ohio St.3d 217.
 {¶ 24} A mistrial should not be ordered in a criminal case merely because some error or irregularity has occurred, unless the substantial rights of the accused or the prosecution are adversely affected.Goerndt, supra. This determination is made at the discretion of the trial court. Id. The granting of a mistrial is necessary only when a fair trial is no longer possible. Id. Therefore, the essential inquiry is whether the substantial rights of the accused are adversely or materially affected. Id. *Page 9 
 {¶ 25} In the present case, Ervin argues that a mistrial should have been granted when Agent Torsney testified during the culpability phase concerning Ervin's arrest for another crime. We are not persuaded.
 {¶ 26} Prior to Agent Torsney's testimony, Ervin made a motion in limine to prevent Agent Torsney from testifying that on March 19, 2004, he was there to arrest Ervin on a federal murder warrant from a case unrelated to the March 18, 2004 murders. In addition, Ervin moved to prevent Agent Torsney from testifying that he was hiding from the agent. The trial court partially granted Ervin's motion.
 {¶ 27} Agent Torsney then testified that when he arrested Ervin the day after the murders, Ervin had two $100 bills and $400 in $20 bills. Agent Torsney testified that he did not seize the money as evidence because at the time of the arrest, he was unaware of the murders that occurred the day before. Ervin's attorneys did not object to this line of questioning. However, on cross-examination, defense counsel questioned whether Agent Torsney had arrested individuals involved in either drug sales or drug purchases and whether they had cash on them. Defense counsel then implied that Agent Torsney had done something improper in not seizing the money. On redirect, the prosecution confirmed that at the time of the arrest, Agent Torsney did not know about the murders and that was why he did not seize the money. Defense counsel moved for a mistrial and the trial court denied the motion. *Page 10 
 {¶ 28} In making its ruling, the trial court explained that Agent Torsney did not testify that he arrested Ervin on an unrelated federal murder warrant, nor did Agent Torsney testify that Ervin hid to avoid the arrest. The trial court stated that the testimony did not leave the jury with any idea that Ervin was involved in other crimes; all the jury knew was that he was arrested, he had money on him, and that money was returned to his girlfriend. The trial court concluded that this testimony did not warrant a mistrial. We agree with the trial court's decision.
 {¶ 29} In State v. Klein (Jan. 13, 1988), Wayne App. No. 2280, the ninth appellate district denied the defendant's motion in limine to exclude any evidence concerning his arrest in Akron on a robbery charge several hours subsequent to the offense for which he was on trial. The trial court concluded that the testimony and evidence of the fact of the arrest could be presented without permitting the reason for said arrest to be disclosed. Id. The appellate court upheld the trial court's ruling that allowed the State to present evidence of the arrest but not the reason for the arrest. Id. The court then cited to State v. Watson
(1971), 28 Ohio St.2d 15, 21, for the proposition that evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. Id.
 {¶ 30} Likewise in the present case, Agent Torsney testified that he placed Ervin under arrest and that he did not seize the $600 Ervin had on his person. Agent Torsney never testified that he arrested Ervin on an unrelated federal murder *Page 11 
warrant. The State elicited the testimony to show when and how Ervin was taken into custody and why Agent Torsney did not seize the money. Accordingly, we conclude that Ervin's substantial rights were not violated and that a fair trial was possible. The trial court did not err when it denied Ervin's motion for a mistrial.
 {¶ 31} Ervin also argues that the trial court should have granted a mistrial when the prosecution cross-examined his mother, Annie Ervin, during the mitigation phase of the trial regarding her involvement in smuggling drugs into jail for Ervin. We disagree.
 {¶ 32} During the mitigation phase, Annie Ervin ("Annie") described a history of drug abuse and drug dealing within the family home. Annie claimed she tried to talk to Ervin about his drug use and dealing, but Ervin continued. Annie described her son as a follower and supported the defense position that Ervin had no choice but to follow the criminal path.
 {¶ 33} The State of Ohio ("State") sought to impeach Annie's testimony that she disapproved of Ervin's drug dealing and establish that she benefitted from and was involved with Ervin's drug dealing. On cross-examination, the State asked Annie whether she had been sneaking drugs into Ervin while he was incarcerated. Defense counsel objected, the trial court sustained the objection, and Annie was prevented from answering the question. *Page 12 
 {¶ 34} When the State asked this question, it was in possession of recorded telephone calls made by Ervin from the county jail. According to the State, these calls included phone conversations with Annie wherein they discussed how his mother should bring drugs to him, how she was to pick them up, the inflated costs of drugs in jail, and humor over how much money Ervin was making by selling drugs in jail. In asking Annie whether she smuggled drugs to Ervin inside the county jail, the State argued that defense counsel had opened the door to this line of questioning based upon testimony of Ervin's character.
 {¶ 35} In State v. Clark (1988), 38 Ohio St.3d 252, the Ohio Supreme Court held that "when a defendant raises the issue of history, character and background during the mitigation phase of a capital trial, he opens the door `to all relevant evidence.'" See, also, State v. Jackson
(Oct.5, 1989), Cuyahoga App. No. 55758. See, also, Evid.R. 405(B). InClark, the defendant offered evidence to show he was a "quiet, religious man and good father" with a potential for rehabilitation. The court held that the defendant's prior criminal record was admissible to rebut this evidence. Id. Additionally, the court noted that Evid.R. 405(B) provides that once the defendant introduces character evidence, his character witness is subject to cross-examination about relevant specific instances of conduct. Id.; Jackson, supra.
 {¶ 36} Annie Ervin's testimony was designed to show that her son was a follower and that because of his drug use, low intellect, and family history of crime, *Page 13 
he had no choice but to follow the criminal path. The State attempted to rebut this evidence by showing that Ervin continued to break the law outside of the influence of his family members.
 {¶ 37} More importantly, the trial court sustained defense counsel's objections regarding the State's question. Annie never answered whether she smuggled drugs into the county jail and the jury never heard the State's evidence concerning the recorded phone calls. Finally, the trial court provided the following instruction to the jury during the mitigation phase:
 "You must not speculate as to why the court sustained an objection to any question or what the answer to such question might have been.
 You must not draw any inferences or speculate on the truth of any suggestion included in a question that was not answered."
 {¶ 38} A jury is presumed to follow instructions given to them by trial judge. State v. Garner, 74 Ohio St.3d 49, 1995-Ohio-168.
 {¶ 39} For all these reasons, we find that the trial court did not err when it denied Ervin's motion for a mistrial during the mitigation phase of his trial.
 {¶ 40} Ervin's first assignment of error is overruled.
 {¶ 41} In his second assignment of error, Ervin argues that his constitutional
 {¶ 42} rights were violated when the trial court failed to properly merge the aggravated circumstances during the culpability and mitigation phases of his trial. We shall address each portion of Ervin's trial separately. *Page 14 
 {¶ 43} The grand jury indicted Ervin with two counts of aggravated murder for Lovett and two counts of aggravated murder for Burton. All four counts contained three felony murder specifications pursuant to R.C. 2929.04(A)(7), with the underlying crimes being aggravated burglary, aggravated robbery, and kidnapping, two mass murder specifications pursuant to R.C. 2929.04(A)(5) for purposely killing Lovett and Burton and purposely attempting to kill Pitts, and three specifications of murder to escape accounting for other crimes pursuant to R.C. 2929.04(A)(3).
 {¶ 44} Prior to deliberations during the culpability phase, defense counsel moved the court to merge all the above specifications into one course of conduct specification. The trial court denied Ervin's motion on the basis that the State had the burden of proof to establish the specifications before they could be merged. The trial court noted that if the specifications were established beyond a reasonable doubt, then it would be obligated to merge them as required by law.
 {¶ 45} After deliberating, the jury found Ervin guilty of all crimes charged and all specifications outlined above; except, under the felony murder specifications, the jury found that Ervin was not the principal offender but that he did act with prior calculation and design.
 {¶ 46} Ervin argues the trial court erred when it failed to merge the specifications prior to deliberation during the culpability phase. In support of his argument, Ervin cites to the cases of State v.Adams, 103 Ohio St.3d 508, 2004-Ohio-5845; *Page 15 State v. Jenkins (1984), 15 Ohio St.3d 164; and State v. Mitts,81 Ohio St.3d 223, 1998-Ohio-635. However, a careful review of all three cases reveals that duplicative death penalty specifications must be merged at the sentencing phase. The cases cited above do not provide this court with any support for Ervin's argument that the trial court should have merged the specifications prior to the jury's deliberations of guilt, nor do they support his request for a new trial. Therefore, pursuant to App.R. 12(A)(2) and App.R. 16(A)(7), we disregard this portion of Ervin's appeal.
 {¶ 47} We shall now address Ervin's argument regarding the mitigation phase. During the mitigation portion of his trial, Ervin moved the court to merge the four aggravated murder counts to two counts, one for each victim, and merge the specifications on each count into a single course of conduct specification. The trial court partially obliged Ervin's request. With respect to each of the four aggravated murder counts the trial court merged the three felony murder specifications into one, the two mass murder specifications into one, and the three murder to escape accounting for another crime specifications into one. In addition, the trial court instructed the jury that although there were more aggravating circumstances found by the jury during the trial phase, some had merged and the jury was only to consider the aggravating circumstances described by the court. After deliberations, *Page 16 
the jury recommended life without the possibility of parole on all four aggravated murder counts.
 {¶ 48} Ervin argues the trial court committed reversible error when it failed to merge the specifications prior to deliberation during the mitigation phase of his trial. We disagree.
 {¶ 49} Duplicative death-penalty specifications should be merged when they "arise from the same act or indivisible course of conduct."Adams, supra; State v. Jenkins, 15 Ohio St.3d 164, paragraph five of the syllabus. "However, when the offenses illustrate a separate animus and do not show an indivisible course of conduct, merger is not required."Adams, supra.
 {¶ 50} The merger requested by Ervin was not required in the instant case because the specifications, as merged by the trial court, were not duplicative for punishment purposes. Murder while committing a felony, such as aggravated burglary, R.C. 2929.04(A)(7), and during a course of conduct of purposeful killing, R.C. 2929.04(A)(5), as charged in counts one through four, are not duplicative. See, State v. Adams, supra;State v. Smith, 80 Ohio St.3d 89,116.
 {¶ 51} However, we do find that the R.C. 2929.04(A)(3) and (A)(5) specifications of aggravating circumstances arose from the same act or indivisible conduct, i.e., killing of Lovett and Burton. See,Adams, supra. Thus, those aggravating circumstances could have been merged prior to the penalty phase. *Page 17 
Nevertheless, the jury's consideration of the duplicative aggravating circumstances does not warrant reversal of Ervin's life sentence. Id. By all indications, the duplicative aggravating circumstances had no impact on the jury's sentencing recommendation. In this regard, we note that the jury found the aggravating circumstances did not outweigh the mitigating circumstances and recommended a sentence of life in prison.
 {¶ 52} Accordingly, we overrule Ervin's second assignment of error.
 {¶ 53} In his third assignment of error, Ervin argues the trial court erred when it allowed the State to present unfairly prejudicial evidence during the mitigation portion of his trial. Although this assignment of error raises issues similar to Ervin's first assignment of error, we have chosen to address the issues separately.
 {¶ 54} During the mitigation phase of Ervin's trial, the State's attorney made allegations that Ervin continued to sell drugs while in the county jail and accused Ervin's mother of smuggling the drugs into him at the jail. Ervin argues that this evidence constitutes nonstatutory aggravating circumstances. In other words, Ervin claims that by making these allegations in front of the jury, the State improperly attempted to show facts that weigh in favor of a harsher punishment and against the mitigation evidence. We disagree.
 {¶ 55} In Clark, supra, the Ohio Supreme Court heard a similar issue to the one presented herein by Ervin. The court held that although the appellant carries *Page 18 
the burden of going forward with evidence of mitigating factors, he opened the door for the State to introduce rebuttal evidence. Id. InClark, the Ohio Supreme Court upheld rebuttal evidence used to impeach the appellant's evidence of his history, character, and background proffered in mitigation. The court then overruled Clark's argument that the impeachment evidence constituted the admission of nonstatutory aggravating circumstances. We shall apply the holding of Clark to the facts of the instant case.
 {¶ 56} The crux of defense counsel's theory of mitigation was that Ervin was a follower and because of his drug use, low intellect, and family history of crime, he had no choice but to follow the criminal path. Therefore, because Ervin raised the issue of history, character, and background, he opened the door to all relevant evidence.Clark, supra; Jackson, supra.
 {¶ 57} The State's line of questioning objected to by Ervin sought to rebut this theory by demonstrating that while Ervin was away from his family members and incarcerated in the county jail, he continued to sell drugs and break the law. This line of questioning was permissible because Ervin himself, "opened the door to all relevant evidence."Clark, supra; Jackson, supra. We therefore conclude that this impeachment evidence did not constitute the admission of nonstatutory aggravating circumstances.
 {¶ 58} Accordingly, we overrule Ervin's third assignment of error. *Page 19 
 {¶ 59} In his fourth assignment of error, Ervin argues the prosecutor committed misconduct, thereby depriving him of a fair trial. Ervin finds error with the prosecutor's closing remarks made during both the culpability and mitigation phases of his trial. For the following reasons, we disagree with Ervin's arguments.
 {¶ 60} "The standard of review for prosecutorial misconduct is whether the comments and questions by the prosecution were improper, and, if so, whether they prejudiced appellant's substantial rights." State v.Peterson, Cuyahoga App. No. 88248, 2007-Ohio-1837; State v. Treesh,90 Ohio St.3d 460, 480, 2001-Ohio-4. Prosecutorial misconduct will not provide the basis for reversal unless it can be said that the misconduct deprived the appellant of a fair trial based on the entire record.Peterson, supra. "The touchstone of the analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Gapen,104 Ohio St.3d 358, 2004-Ohio-6548.
 {¶ 61} Generally, prosecutors are entitled to considerable latitude in opening and closing argument. State v. Ballew, 76 Ohio St.3d 244,1996-Ohio-81. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Lott (1990), 51 Ohio St.3d 160, 165. "Moreover, because isolated incidents of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine *Page 20 
whether the defendant has been prejudiced." State v. Stevens, Montgomery App. No. 19572, 2003-Ohio-6249; Ballew, supra.
 {¶ 62} During closing argument in the culpability phase, the prosecutor attacked the defense's position that on the night of the murders, Ervin's role in the murders was in question and he may not have been as involved as his codefendants. The prosecution told the jury that this theory insulted their intelligence and suggested the defense attorneys did not value the lives of the victims. The trial court sustained the defense counsel's objection at the end of this argument.
 {¶ 63} During the mitigation closing argument, the prosecutor again attacked the defense's position that Ervin was not the principal offender. Specifically, the prosecutor stated to the jury that because Ervin wore a mask, the jury would all be baffled and give Ervin a free pass.
 {¶ 64} However, in making these arguments, Ervin fails to specifically argue how these comments rise to the level of prosecutorial misconduct. Though Ervin claims the comments deprived him of a fair trial, he does not specifically argue why or how his rights were deprived. "If an argument exists that can support this assignment of error, it is not this court's duty to root it out." State v. Walker, Cuyahoga App. No. 87677, 2006-Ohio-6188. Moreover, Ervin does nothing to persuade this court from the conclusion that the prosecutor in this case was merely commenting on the evidence and reasonable inferences that were drawn therefrom. *Page 21 
Finally, this court has reviewed the State's closing argument in its entirety and has determined that no prejudice occurred.
 {¶ 65} Accordingly, Ervin's fourth and final assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, JUDGE
ANTHONY O. CALABRESE, JR., P.J., and ANN DYKE, J., CONCUR
 Appendix A
Assignments of Error *Page 22 "I. The appellant was denied his right to a fair trial by an impartialjury under the Sixth and Fourteenth Amendments when the court refused togrant a mistrial after unfairly prejudicial evidence was introducedagainst him during the culpability phase and again during the penaltyphase.
 II. Appellant's Sixth, Eighth, and Fourteenth Amendment rights to dueprocess of law and a fair sentencing hearing were violated when thetrial court failed to properly merge the aggravating circumstances.
 III. Appellant's Sixth, Eighth, and Fourteenth Amendment rights to dueprocess of law and a fair sentencing hearing were violated when the juryheard unfairly prejudicial evidence that could not be properlyconsidered in a capital mitigation proceeding.
 IV. The appellant was denied his Sixth Amendment right to a fair trialbecause of unfairly prejudicial prosecutorial misconduct."
[1] Each codefendant was indicted separately as their identity became known to the investigating detectives. *Page 1